**Johnnie FULLILOVE, Plaintiff-Appellant,**

v.

**CHICAGO, ROCK ISLAND & PACIFIC RAILROAD COMPANY and The Pennsylvania Railroad Company, Defendants-Appellees.**

**No. 13050.**

United States Court of Appeals
Seventh Circuit.

Jan. 27, 1961.

Rehearing March 13, 1961.

Edward Levett, Chicago, Ill., Arthur F. Penway, of Chicago, Ill., of counsel, for appellant.

Donald J. O'Brien, O. L. Houts, Max E. Wildman, for Chicago, R. I. & P. Ry. Co.

Robert H. Bierma, A. L. Foster, Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., for defendant-appellee, Pennsylvania R. Co., Frederick W. Temple, Chicago, Ill., of counsel.

Before SCHNACKENBERG, KNOCH and CASTLE, Circuit Judges.

KNOCH, Circuit Judge.

Plaintiff sued to recover damages for personal injuries, charging common law

negligence. Both defendants moved for a directed verdict of not guilty at the conclusion of the plaintiff's case on the issue of liability only. The Trial Court instructed the jury to find for the defendants. Plaintiff appealed from judgment entered on that finding.

Plaintiff's employer, Continental Grain Company, hereinafter called "Continental", ordered 30 box cars from defendant Chicago, Rock Island & Pacific Railroad Company, hereinafter called "Rock Island", the only railroad that had tracks leading into Continental's yards, with instructions to place the order with defendant Pennsylvania Railroad Company, hereinafter called "Pennsylvania", each railroad to be paid a fee for its services in moving the cars. Pennsylvania delivered the cars to Rock Island, which received them on July 1, 1956. William H. Davies, an assistant agent for Rock Island, testified that the cars were inspected and no defects recorded. Nothing was done to the cars until July 3, 1956, when Rock Island pulled them into Continental's yards, where the Western Weighing and Inspection Bureau coopered them for grain loading by nailing wooden grain doors on the inside to prevent the grain, with which they would be loaded, from pouring out of the car.

Continental's foreman, Ray Fox, testified that about 3:30 P.M. on July 3, 1956, his attention was drawn to the fact that the door next to the loading platform on car No. 22976, which had been coopered, would not open. The door on the other side was open, but loading had to be done from the platform side. The loader had tried to open the closed door with a special prying bar. Mr. Fox testified that he looked for an obstruction at the locked portion of the door. Finding none there, he looked at the back. Two rails, a bottom and a top rail, held the door in place when closed. Each rail extended approximately a door's width to the right in order to accommodate the opening of the door and to hold it in place when opened. The weight of the door rested largely on the lower rail, and the upper rail served the purpose of keeping the door in place and of aiding its opening movement. Mr. Fox, facing the closed door, saw a dip or a bend in the bottom rail on which the door was set. The dip or bend began about two inches to the right of the closed door on the lower rail. It was about 1 to 1¼ inches deep and extended along the lower rail for about twelve to fourteen inches.

Mr. Fox then testified about his efforts to open the door. First he endeavored to do so by hand. That failing, he tried to open the door with a six-sided bar, 40 to 44 inches long, about 1-1¼ inches thick, flattened out on one end, and pointed on the other, something like a crowbar without a hook but with a slight bend. Facing the door, he tried to push it to the right. Then he tried to put the sharp end of the bar through on the left side of the door, alongside the lock, to open a crack into the grain door to get leverage. He put pressure on the bar by pulling to the left, hoping to push the door to the right. This attempt to open the door also failed. He testified that the door is constructed so that a top 1 or 1¼ inch flange on the door fits up into the top rail. Next he used the bar at the right side of the door to pry the door up from the bottom rail on which it rested, putting the bar near the place of the bend in the rail. He was able to raise the door slightly and he saw no obstruction. Then he tried the bar at the left side of the door again. This procedure brought about no results.

He testified further that after these efforts failed, he used a car puller to open the door. This car puller, which is about one foot high and which is operated by a motor, is used to pull loaded box cars weighing about 42,000 to 50,000 pounds. Mr. Fox then examined the bottom rail and found a metal piece about ¾ of an inch high, ¾ to 1 inch wide, and 4 to 6 inches long, welded to the rail, at the right side of the bend, which helped to hold the door to the side of the car. When the door was open, the front part of the door was setting on the edge of the dip. There was rust on the weld. Weather reports showed that there had

been little moisture in the air during the period from June 23, to July 3, 1956. When the door was forced open, it traveled behind the weld. At this time Mr. Fox also noticed that only about ¼ or 3/16 inch of the top flange of the door was fitting inside the top rail, to hold the door to the car at the top. He testified that the door condition appeared to him to be dangerous. He stated that he had mentioned this to someone, whom he couldn't name, but not to plaintiff nor to the men who would have to close the door. The door at this point was standing open. It remained in this position while the car was being loaded and moved. The danger would arise in closing the door.

After the car had been loaded and had been moved to another part of the yard, some twenty to twenty-five minutes later, plaintiff came along and performed his duties as a grain sampler. He had got out of the car and was standing alongside the car, marking the car number on a ticket and putting the ticket in his sampling bag. Other employees began to push the door shut. Mr. Fox saw them doing this as he walked toward the car. He saw the door fall off the car and strike plaintiff.

Plaintiff contends that defendants were negligent in delivering a defective car; that the jammed door and the defect in the bent rail were the proximate causes of the accident; that the forcible means used to open the door constituted a foreseeable intervening cause which did not break the causal connection between defendants' alleged negligence and plaintiff's injuries; and that, in any case, the question of proximate cause was a matter to be decided by the jury.

The Trial Judge found that the sole, efficient cause of the injury was the action of the foreman who created the dangerous situation by applying the great force of the car mover and then going off and leaving this known dangerous situation without warning to plaintiff or to the employees who would have to close the door.

Viewing the evidence in the light most favorable to the plaintiff [Gunning v. Cooley, 1930, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720] we can only conclude that the negligence charged to defendants did no more than furnish a condition whereby injury was made possible through the subsequent, independent act of the foreman in applying the tremendous force of the car puller which pulled the door downward as well as sideways. This action was an efficient unforeseeable intervening cause which did break any causal connection which might have existed between the negligence which plaintiff imputes to the defendants and the injury, making any such negligence a remote and not a proximate cause of the injury. Merlo v. Public Service Co., 1943, 381 Ill. 300, 316, 45 N.E.2d 665, 675, and cases cited therein.

There was no evidence to show that the car door was built to withstand the force of the powerful car puller. We have weighed all other arguments advanced by plaintiff and find them without merit.

The judgment of the Trial Court is affirmed.